## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

IN THE MATTER OF **2003 silver Land Rover SUV Silver bearing Florida tag IMW95- registered to Christopher Bones**

Case No.: 5:20mj43-MJF

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

### I. INTRODUCTION

I, Kevin M. Miller, being first duly sworn, hereby depose and state as follows:

1. I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") currently assigned to the Panama City Office. I have been a Special Agent with DEA for approximately eight years. Prior to joining DEA, I was a police officer for the Tallahassee Police Department in Tallahassee, Florida, for approximately 10 years. As a Special Agent and law enforcement officer/investigator, your applicant has participated in hundreds of drug trafficking investigations as both the case agent and support roles. Your affiant has received extensive training in the identification,

1

investigation, and apprehension of felony law violators both in Federal and State jurisdictions. Your Affiant is currently assigned to the Drug Enforcement Administration Panama City Florida office, and has conducted and participated in numerous felony investigations resulting in the arrest and successful conviction of felony offenders.

3. Since this affidavit is being submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation. More specifically, I have set forth only those facts that I believe are necessary to establish the required foundation for an order authorizing the search of the specifically described residences, cellular telephones, and vehicles (see below and Attachment A for specific descriptions).

## II. BACKGROUND OF THE INVESTIGATION

4. Since May 2019, the Drug Enforcement Administration (DEA) and other law enforcement agencies have been conducting an investigation into a network of drug traffickers that have unlawfully distributed methamphetamine, heroin, cocaine, and prescription pills in Walton County, Florida, and the surrounding area. The investigation thus far has identified that this network of drug traffickers includes James Young (hereinafter, "Young"), Young's partner and girlfriend Shelley Johnson (hereinafter, "Johnson"), Christopher Bones (hereinafter,

2

"C. Bones"), and others, who sell methamphetamine, heroin, cocaine, and prescription pills in Walton County, Florida.

5. Information obtained during the investigation, which is set forth in this affidavit, shows that Young is a methamphetamine, heroin, cocaine, and prescription pill supplier in Walton County, Florida, who obtains methamphetamine and heroin from an unidentified source of supply (UBM-1) believed to be located in the Atlanta, Georgia, area. Further your affiant believes that the unidentified source of supply uses a courier, identified as Donald Black ("Black"), to transport the methamphetamine and heroin to Young in Walton County, Florida. Young then provides methamphetamine and heroin to his girlfriend and partner, Johnson, and numerous other drug customers/dealers who further distribute the drug to other customers. One of Johnson's mid-level methamphetamine customers has been identified as Christopher Bones.

6. Based on facts set forth in this affidavit, DEA has identified the following locations used by Young, Johnson, and C. Bones to store illegal drugs, drug proceeds, and other evidence used to facilitate the distribution of controlled substances, in violation of 21 U.S.C. §§ 841, and 846. These locate are: 1) 680 Mallet Bayou Road, Freeport, Florida [**SUBJECT PREMISE 1** – Johnson], 2) 1390 Sexton Road, DeFuniak Springs, Florida [**SUBJECT PREMISE 2** – Young],

3

and 3) 69 Macy Lane, Santa Rosa Beach, Florida [**SUBJECT PREMISE 3** – Bones]. All three residences are located within the Northern District of Florida. Your affiant also seeks authorization to search and seize the vehicles used by Shelley Johnson, James Young, and C. Bones, all of which are described in this affidavit and Attachment A. These vehicles were used to violate 21 U.S.C. §§ 841 and 846 within the Northern District of Florida. Finally, your affiant seeks authorization to search and seize cellular phones used by Johnson and Young to violate 21 U.S.C. §§ 841 and 846. These cellular phones are referred to as Target Telephone 1 (Johnson) and Target Telephone 2 (Young).

7.    Your affiant believes that Johnson and Young work together to sell methamphetamine, heroin, cocaine, and prescription pills to several lower level drug dealers who then further distribute the drugs in the Walton County area. Further, facts set forth in this affidavit show that C. Bones is both a heroin source of supply to Johnson and also Johnson's methamphetamine customer. Young, Johnson, and C. Bones all live and distribute drugs in the Walton County, Florida, area.

8.    The facts set forth in this affidavit are based on confidential source information, undercover controlled purchases of methamphetamine, federally authorized court intercepts of wire and electronic communication for telephones used by Johnson (Target Telephone 1) and Young (Target Telephone 2), physical

4

surveillance, camera footage from a covert camera installed outside of **SUBJECT PREMISES 1**, GPS tracking data from tracking devices embedded in "trap" devices provided to and used by Johnson and Young, administrative subpoenaed telephone toll records and other investigative techniques.

## III. PROBABLE CAUSE

### CS#1:

9.      Information Received from Confidential Source #1: Prior to conducting controlled purchases of methamphetamine from Johnson in this investigation, Confidential Source # 1 (hereinafter, "CS#1") supplied Johnson with cocaine in the past. CS#1 was cooperating with law enforcement in an effort to mitigate his/her own felony drug charges. Although CS#1 did not specify a time period, CS#1 indicated that he/she had not sold cocaine to Johnson for some time. As a result, CS#1 and Johnson had not recently interacted with each other. In May, 2019, through mutual friends, CS#1 obtained Johnson's phone number (850) 842-1976 (hereinafter, "Target Telephone 1") and reestablished contact with Johnson. On or about May 13, 2019, CS#1 provided law enforcement with the phone number for Target Telephone 1.

10.     Other than the controlled phone calls and controlled purchases of methamphetamine detailed below, CS#1's information was limited in scope and

5

detail. CS#1 is no longer in a position to provide law enforcement with information related to Johnson's drug trafficking activities due to his/her arrest. CS#1 was terminated as a confidential source because of his/her continued use of controlled substances, and because he/she lied to law enforcement about this usage. Nevertheless, the information provided by CS#1 was found reliable particularly because law enforcement independently corroborated the information. For example, the phone number provided by CS#1 as belonging to Johnson was verified by law enforcement. Also, all controlled purchases by CS#1 were recorded, and, in terms of this investigation, all but one controlled purchase was completed in tandem with a law enforcement officer acting in an undercover capacity.

11.     From on or about May 13, 2020, to January 15, 2020, law enforcement conducted approximately six controlled purchases of methamphetamine from Johnson and/or Young, utilizing CS#1 and/or an undercover law enforcement agent (UC). Five of these controlled purchases were completed at **SUBJECT PREMISE 1**. All of the transactions were audio and video recorded.

**May 13, 2019, Controlled Buy**:

12.     On or about May 13, 2019, law enforcement conducted a controlled purchase of approximately one ounce of methamphetamine from Johnson utilizing CS#1 in Walton County, Florida. On May 13, 2019, law enforcement met CS#1 at

6

a pre-determined location. While at the controlled meeting location, CS#1 was searched prior to and after the controlled purchase and provided with a video recording device during the controlled purchase. CS#1 was provided with $425.00 in Official Advanced Funds (hereinafter, "OAF") to purchase the methamphetamine.

13. On May 13, 2019, prior to CS#1 meeting Johnson, CS#1 and Johnson exchanged a series of recorded phone calls and text messages setting up the transactions.1 During the recorded phone calls/text messages, Johnson agreed to sell one ounce of methamphetamine to CS#1 for $425.00.

14. On May 13, 2019, CS#1 was followed to and from a controlled meeting location to **SUBJECT PREMISES 1**. Based on statements provided to law enforcement after the controlled purchase, and in conjunction with a review of the recording device provided to CS#1, your affiant believes that CS#1 met Johnson outside the residence and they both went inside together. While inside, Johnson discussed selling cocaine as well as methamphetamine. Johnson provided approximately one ounce of suspected methamphetamine to CS#1 in exchange for $425.00 in OAF.

15. CS#1 departed the residence and subsequently met with law

---

1 All text messages not involved in the Title III wire and electronic intercept were photographed by law enforcement.

enforcement at a controlled meeting location where CS#1 provided law enforcement with the suspected methamphetamine.[2]

**May 22, 2019, Controlled Buy:**

16. On or about May 22, 2019, agents with the DEA conducted a controlled purchase of methamphetamine from Johnson utilizing CS#1 and an undercover officer (hereinafter, "UC#1") in Walton County, Florida.

17. Prior to the meeting, CS#1 and Johnson exchanged controlled phone call(s)/text message(s). During the recorded calls/text messages, Johnson agreed to meet CS#1 at the **SUBJECT PREMISES 1** to sell CS#1 methamphetamine.

18. CS#1 was searched before and after meeting with Johnson. CS#1 was equipped with a video/audio recording device. UC#1 was provided with $1,400.00 in OAF to purchase the methamphetamine.

19. UC#1 and CS#1 departed the controlled meeting location and drove to Johnson's residence. While at Johnson's residence, UC#1 and CS#1 met with Johnson inside **SUBJECT PREMISES 1**. UC#1, CS#1, and video later verified that Johnson discussed having enough methamphetamine to sell UC#1 and CS#1 but did not want to sell them three ounces because she had other customers she had to

---

2 Law enforcement subsequently conducted a field-test of the suspected methamphetamine which provided a presumptive positive result for methamphetamine. Final chemical analysis of the suspected methamphetamine is still pending.

take care of that day. Johnson agreed to sell UC#1 and CS#1 two ounces of methamphetamine for $750.00. Johnson provided UC#1 with approximately two ounces of suspected methamphetamine in exchange for $750.00 in OAF.

20.    During the meeting, UC#1 showed Johnson a common household device designed with a hidden compartment or "trap"[3] inside of it. The UC discussed providing/selling Johnson the device so she could utilize it to safely transport her methamphetamine in her car without fear of detection by law enforcement. Johnson appeared to be interested in the device but wanted something more compact.

21.    UC#1 and CS#1 obtained approximately two ounces of suspected methamphetamine from Johnson in exchange for $750 DEA OAF.[4]

**June 5, 2019, Controlled Buy:**

22.    On or about June 5, 2019, agents with the DEA conducted a controlled purchase of methamphetamine from Johnson utilizing UC#1 in Walton County, Florida.

---

3 A "trap" is a hidden compartment designed to conceal items placed inside of it. It is commonly used by drug traffickers to hide controlled substances during transport.

4 Law enforcement subsequently conducted a field-test of the suspected methamphetamine which provided a presumptive positive result for methamphetamine. Final chemical analysis of the suspected methamphetamine is still pending. Approximately three ounces of methamphetamine was obtained.

23. On or about June 5, 2019, CS#1 met with law enforcement at a controlled meeting location. UC#1 was equipped with a video recording device and provided $1,200.00 in OAF to purchase methamphetamine. Prior to the meeting, CS#1 conducted a controlled call with Johnson during which Johnson agreed to meet UC#1 at **SUBJECT PREMISES 1** to sell him methamphetamine.

24. At approximately 12:25 p.m., UC#1 departed a predetermined meeting location for Johnson's residence. At approximately 12:35 p.m., UC#1 arrived at Johnson's residence. UC#1 subsequently met with Johnson inside the residence where she provided UC#1 with approximately three ounces of methamphetamine in exchange for $1,200.00 in OAF. Johnson also provided UC#1 with a plastic baggie with "Shelley 842 1976" (Johnson's telephone number **Target Telephone 1**) written on it. UC#1 subsequently departed the residence with the suspected methamphetamine[5].

### September 4, 2019 Controlled Buy:

25. On or about September 4, 2019, a controlled purchase of methamphetamine was completed with Johnson utilizing UC#1 at 680 Mallet Bayou Drive, Freeport, Florida. Prior to meeting, UC#1 and Johnson exchanged recorded

---

5 Law enforcement subsequently conducted a field-test of the suspected methamphetamine which provided a presumptive positive result for methamphetamine. Final chemical analysis of the suspected methamphetamine is still pending.

phone call(s)/text message(s) during which Johnson agreed to sell methamphetamine to UC#1 at **SUBJECT PREMISES 1**.

26.     Prior to the meeting, UC#1 was equipped with a video/audio recording device and provided $1,400.00 in OAF. UC#1 subsequently met Johnson at her residence. During the meeting, UC#1 showed the trap device to Johnson (hereinafter referred to as the Johnson Trap Device). Johnson wanted the trap device and requested UC#1 to build her an additional "trap" device. Johnson and UC#1 discussed Johnson obtaining a second "trap" device for another individual. Additionally, Johnson asked UC#1 if he could build her a "trap" inside her residence to hide her drugs from her probation officer during routine searches of the residence. UC#1 stated that he would build her a "trap" inside the residence at a later date.

27.     During the meeting, UC#1 asked for three ounces of methamphetamine from Johnson. Johnson provided three baggies of suspected methamphetamine to UC#1. Johnson told UC#1 that the methamphetamine in each baggie did not weigh enough to make three ounces. UC#1 and Johnson agreed to make up the difference during their next transaction. UC#1 provided $1,250.00 in OAF to Johnson in exchange for the methamphetamine.[6] UC#1 subsequently departed the residence

---

6 Law enforcement subsequently conducted a field-test of the suspected methamphetamine which provided a presumptive positive result for methamphetamine. Final chemical analysis of the suspected methamphetamine is still pending.

with the methamphetamine and the trap device.

### Delivery of Johnson Trap and November 20, 2019, Controlled Buy:

28. On or about November 20, 2019, UC#1 delivered a trap device,[7] containing a GPS tracking device, to Young in exchange for approximately 37 grams of methamphetamine at the Waffle House, located at 22913 Panama City Beach Parkway, Panama City, Beach, Florida.

29. Between November 19, 2020, and November 20, 2020, UC#1 and Johnson exchanged recorded phone call(s)/text message(s) where Johnson agreed to sell UC#1 methamphetamine in exchange for a trap device to be used by Young (hereinafter referred to as the Young Trap Device).

30. On November 20, 2019, at approximately 6:35 p.m., law enforcement observed, via pole camera[8] located at the **SUBJECT PREMISES 1**, two people,

---

7 Throughout the investigation, Johnson and Young are believed to have used the Trap Devices to transport and store illegal drugs. On or about September 10, 2019, the Honorable Michael J. Frank, U.S. Magistrate Judge for the Northern District of Florida, signed an order authorizing the installation of a GPS tracker in the trap device. On or about October 31, 2019, the Honorable Michael J. Frank, U.S. Magistrate Judge for the Northern District of Florida, signed an order authorizing the continued use of the trap device provided to Johnson. On or about March 17, 2020, the Honorable Michael J. Frank, U.S. Magistrate Judge for the Northern District of Florida, signed two orders authorizing the installation of a GPS tracker device for the Young Trap Device and the Johnson Trap Device.

8 During the course of the investigation, law enforcement installed a pole camera capable of observing the front and side yard of the **SUBJECT PREMISES 1**. Prior to installing the camera, law enforcement acquired a federal warrant authorizing the installation of the pole camera.

12

later identified as Young and Johnson, depart the residence in a Ford Mustang.9

31.     At approximately 8:00 p.m., UC#1, equipped with a recording device, arrived in the undercover vehicle and parked at the Waffle House parking lot.

32.     Prior to the meeting, UC#1 and Johnson exchanged recorded phone call(s)/text message(s) where they agreed to meet at the Waffle House in Panama City Beach, Florida.

33.     At approximately 8:48 p.m., UC#1 and law enforcement observed silver Ford Mustang pull into the Waffle House parking lot. The Mustang pulled through the lot and into the Exxon gas station adjacent to the Waffle House parking lot. The Mustang continued through the Exxon and entered the Winn-Dixie parking lot, located at 23200 Front Beach Road, Panama City Beach, Florida.

34.     Law enforcement monitored, via GPS tracking, that the trap device followed the same path as the Mustang, indicating that the trap device was inside the vehicle.

35.     At approximately 8:52 p.m., UC#1 and law enforcement observed the Mustang drive through the Waffle House parking lot and enter the Exxon. Law enforcement observed the occupants of the Mustang, later identified to be Johnson and Young, remain in the Mustang for a brief period. UC#1 then made contact with

_____

9 The Mustang was a rental.

13

Johnson and Young. Young provided UC#1 with the broken trap device, which Young had recovered from the trunk of the Mustang.

36.　At approximately 9:04 p.m., UC#1 recovered the trap/tracking device and provided Young with an operational Young Trap Device containing a hidden GPS tracker. Additionally during the meeting, Young provided UC#1 with approximately 37 grams (1.5 ounces) of suspected methamphetamine in exchange for the trap devices given to Young and Johnson.[10]

**January 15, 2020, Controlled Buy:**

37.　On or about January 15, 2020, agents with the DEA conducted a controlled purchase of methamphetamine from Johnson utilizing UC#1 at the **SUBJECT PREMISES 1**.

38.　Prior to the meeting, UC#1 and Johnson exchanged a series of recorded call(s)/text message(s). During the conversations, Johnson agreed to meet UC#1 to sell UC#1 methamphetamine at the **SUBJECT PREMISES 1**.

39.　Prior to the meeting, UC#1 was equipped with a video/audio recording device and provided with $1,150.00 in OAF during the meeting.

---

10 Law enforcement subsequently conducted a field-test of the suspected methamphetamine which provided a presumptive positive result for methamphetamine. Final chemical analysis of the suspected methamphetamine is still pending.

14

40. At approximately 3:53 p.m., UC#1 arrived at Johnson's residence. Upon arriving, UC#1 made contact with Young who invited UC#1 inside the residence.

41. UC#1 went up the stairs, entered the bedroom, and met with Young. Young and UC#1 discussed the trap device that UC#1 was to repair for Young and a home security camera system that could be viewed from the bedroom. When Johnson entered the room, she asked Young where the methamphetamine was located. Young got off the bed and walked to a table in the bedroom. Young removed a plastic bag containing suspected methamphetamine from small red box and placed the bag under a plate on the same table.

42. UC#1 asked Johnson about the methamphetamine. Johnson pointed to the plate on the table. UC#1 then lifted the plate and took custody of the plastic bag with the suspected methamphetamine. The plastic bag contained approximately three ounces of methamphetamine. UC#1 handed Johnson an envelope containing $1,150.00. Johnson placed the envelope on the table. UC#1 subsequently departed the residence with the methamphetamine. A field-test later indicated that the substance was methamphetamine.

### Target Telephone 1 (Johnson) and Target Telephone 2 (Young):

43. On or about March 17, 2020, DEA began intercepting wire and

15

electronic communications over Target Telephone 1, used by Johnson.[11] Additionally, on or about April 8, 2020, law enforcement began intercepting wire and electronic communications over Target Telephone 2, used by Young.[12]

44. During the period of interception for Target Telephone 1, in conjunction with covert camera footage and physical surveillance, law enforcement acquired evidence of numerous transactions encompassing the distribution of methamphetamine, heroin, and illicit prescription drugs taking place at **SUBJECT PREMISES 1**.

### **Christopher Bones March 20, 2020, Delivery**:

45. For example, as described below, on or about March 20, 2020, your affiant believes that Johnson purchased approximately 7 grams of heroin from Christopher Bones (hereinafter, C. Bones), through an intermediary named Stormy Bones (hereinafter, S. Bones), while at the **SUBJECT PREMIES 1.**

46. On March 20, 2020, Johnson, using Target Telephone 1, and C. Bones, using (850) 517-7834, exchanged a series of text messages and phone calls (Call

---

11 On or about March 17,.2020, the Honorable Casey Rodgers, United States District Judge in the Northern District of Florida issued an order authorizing the interception of oral and electronic communications over Target Telephone 1.

12 On or about April 8, 2020, the Honorable Casey Rodgers, United States District Judge in the Northern District of Florida issued an order authorizing the interception of oral and electronic communications over Target Telephone 2.

16

sessions 2033, 2068, 2074, 2100, 2323). During the conversations, Johnson asked C. Bones if he had any "boi." Your affiant knows that "boi" is a common slang for heroin. Bones asked Johnson how much she wanted and Johnson stated that she needed a "ball or two." C. Bones told Johnson that the heroin was "tanish grayish" in color. Johnson ordered "two balls….A quarter." C. Bones said that he would be at the **SUBJECT PREMISES 1** in 30 minutes. C. Bones later told Johnson that C. Bones "just got home getting situated where you at." [Your affiant believes that during the conversation, Bones agreed to sell 7 grams or two "balls" of "boi" or heroin to Johnson. C. Bones indicated that he was home **(SUBJECT PREMISES 3)** and was getting the heroin ready to sell to Johnson at Johnson's residence **(SUBJECT PREMISES 1)**].

47.    Between 6:22 p.m. and 6:55 p.m., Johnson asked C. Bones where he was at and C. Bones replied that he was on his way. Johnson then asked if C. Bones was "here" **(SUBJECT PREMISES 1)** (Call Sessions 2327, 2343, and 2350).

48.    At approximately 6:53 p.m., law enforcement observed, via a covert camera, a silver Land Rover[13] arrive at the **SUBJECT PREMISES 1**. The Land Rover parked in the driveway near the front door of the residence. Law enforcement

---

13.  2003 silver Land Rover SUV Silver bearing Florida tag IMW95- registered to Christopher Bones.

observed a white female, later identified as S. Bones, walk to the front door of the residence. S. Bones appeared to use the keypad lock on the door, opened the front door and walked inside **SUBJECT PREMISES 1**.

49.     Between 7:00 p.m. and 7:01 p.m., Johnson, using Target Telephone 1, sent C. Bones, using (850) 517-7834, two text messages while S. Bones and Johnson were inside **SUBJECT PREMISES 1** (Call Sessions 2359 and 2361). Johnson asked C. Bones, "700 for this? Correct? So 700 Minus 150 for 2 ball I send 550 Send me confirmation."

50.     Shortly thereafter, C. Bones called Johnson (Call Session 2368). Johnson told C. Bones that he charged her "7" or $700.00 for a "quarter" or a quarter ounce of heroin. Johnson and C. Bones haggle over the price of the heroin and C. Bones agreed to sell Johnson 3.5 grams of heroin for "350" or $350.00 per 3.5 grams. C. Bones then asked if "she gone yet" referring to S. Bones and Johnson replied "No she's right here we were just kind of waiting for you to clarify."

51.     At approximately 7:22 p.m., law enforcement observed, via the pole camera, S. Bones leave Johnson's residence in the silver Land Rover. The Land Rover traveled south after exiting the driveway.

52.     A short time later, law enforcement observed the Land Rover traveling southbound on US Highway 331. Law enforcement observed Florida license plate

18

IMW95 displayed on the Land Rover. [14] This vehicle is registered to C. Bones with a listed address as **SUBJECT PREMISES 3**.

53.     Between March 20, 2020, at approximately 11:27 p.m., and March 21, 2020, at approximately 1:59 a.m., Johnson, using Target Telephone 1, and C. Bones, using (850) 517-7834, exchanged a series of text messages (Call Sessions 2630, 2631, 2643, 2649, 2651, 2653, 2681, 2686, 2688, 2690, 2695, 2697, 2699, 2701, 2703, 2705, 2714, 2731, 2801, 2803, 2805 and 2807). During the conversation, C. Bones was upset with Johnson because Johnson gave S. Bones a prescription pill for S. Bones to personally use.

**UBM-1**:

54.     Based on wire and electronic intercepts on Target Telephone 1, your affiant learned that Johnson was acquiring controlled substances, specifically heroin, cocaine, methamphetamine, and hydrocodone from an unidentified black male ("UBM-1") named "Dre." On April 8, 2020, your affiant acquired judicial authorization to intercept wire and electronic communications on the cellular phone used by UBM-1 (Target Telephone 3).

---

14 Law enforcement, which was familiar with C. Bones and his wife S Bones via a prior law enforcement encounter, was able to positively identify S. Bones as the white female observed via the covert pole camera entering and leaving Johnson's residence. Law enforcement observed a Florida Driver's license photograph of C. Bones and compared it to the video footage. Law enforcement positively identified S. Bones as the female in the video.)

55.     Between March 18, 2020, at approximately 12:43 a.m., and March 19,

2020, at approximately 8:29 p.m., Johnson, using Target Telephone 1, exchanged a

series of text messages with UBM-1, who was using Target Telephone 3 (call

sessions # 616, 618, 1330, 1351, 1388, 1393, 1395, 1480, 1483, 1485, and 1497).

During the conversations, the following was stated:

> Johnson: "What's up...HMU when u come t rough...through...Blues and clear...Hey hey."
>
> UBM-1: "Yo"
>
> Johnson: "Blues?"
>
> UBM-1: "Nope. Just ran out of cream too."
>
> Johnson: "Damn...When u gonna be good?? Why didn't u save me at least what I already paid for."
>
> UBM-1: "I forget til u just said it.  Someone bought a 36 ounces for me."
>
> Johnson: "I'm still more important Lol...So when u gonna be good."
>
> [Your Affiant believes that during the conversation, Johnson wanted UBM-1 to contact her so she could purchase "blues" or Percocets and "clear" or methamphetamine.  UBM-1 told Johnson that UBM-1 just sold out of Percocets and "cream" or cocaine.    Based on below intercepted communications, Johnson was upset because she had pre-paid for an ounce of methamphetamine that UBM-1 did not have for her.  UBM-1 then stated that he just sold "36 ounces" of an unspecified drug.  Johnson asked when UBM-1 would have drugs again.  UBM-1 did not respond.]

56.    On March 20, 2020, at approximately 2:12 p.m., Johnson, using Target

Telephone 1, called UBM-1, who was using **Target Telephone 3** (call Session #

2018). During the conversation, the following was stated:

Johnson: "Are you good on everything?"

UBM-1: "Not cream or boi that shit going to be a couple days."

Johnson: "Dammit man. You got blues?"

UBM-1: "I can grab some from my brother."

Johnson: "I'll take them if you can grab them. Asked for 100."

UBM-1: "Might be half and half then."

Johnson: "I'll take 50 then."

UBM-1: "I think I got 50 on me for real for real."

Johnson: "Can you bring me whatever you got."

UBM-1: "Yeah. I might have clear tomorrow."

[Your Affiant believes that during the conversation, Johnson asked if UBM-1
had acquired more drugs. UBM-1 said that he had not obtained more cocaine
or "boi" or heroin. Johnson asked for Percocets and UBM-1 said that he could
obtain some from his unidentified brother. Johnson asked to purchase "100"
Percocets. UBM-1 said that he might have to get half (50) now and half (50)
later. Johnson agreed to take 50 Percocets from UBM-1. UBM-1 said he
could meet Johnson tomorrow.

57.    Between March 21, 2020, at approximately 11:45 a.m., and March 22,

2020, at approximately 1:09 a.m., Johnson, using Target Telephone 1, exchanged a

21

series of text messages with UBM-1, who was using **Target Telephone 3** (call

sessions # 3284, 3290, 3292, 3293, 3298, 3309, 3311, 3313, 3315, 3317, 3391, and

3393). During these conversations, the following was stated:

UBM-1: "I got your zip. A few on me. But can you meet me? A few on me. But can you meet me?"

Johnson: "Heck yea…Wya…Any blues."

UBM-1: "A few on me. But can you meet me?"

Johnson: "Where…I'm coming through yak."

UBM-1: "Damn"

Johnson: "Wya"

UBM-1: "Destin"

Johnson: "I'll be in seagrove tomorrow on 30-a Please hold it for me if possible"

UBM-1: "I'm home though if u come my way at all"

[Your Affiant believes that during the conversation, UBM-1 told Johnson that he had her "zip" or one ounce of methamphetamine for her, as reference in above conversation.   UBM-1 added that he had several ounces of methamphetamine on him.  Johnson asked for Percocets.  UBM-1 asked if Johnson could meet him.  UBM-1 said that he was in Destin, Florida.  Johnson said that she would be in Seagrove Beach, Florida, tomorrow and wanted UBM-1 to hold the ounce of methamphetamine for her.]

58.     On March 22, 2020, at approximately 1:34 p.m., Johnson, using Target

Telephone 1, received a call from UBM-1, who using **Target Telephone 3** (call

session 3536). During the conversation, the following was stated:

Johnson: "Hey."

UBM-1: "Yeah."

Johnson: "I just woke up, um."

UBM-1: "You just woke up"?

Johnson: "Yeah."

UBM-1: "Girl you talking about you suppose to be at 30-A today."

Johnson: "I know, I am. I I still am I still gotta go."

UBM-1: "What time"?

Johnson: "I mean as soon as I can get dressed and go, like within probably an hour. Why, you over that way?'

UBM-1: "Um I'm around. Yea I was, I was when I was callin you."

Johnson: "Shit, Alright, well"

UBM-1: I'm right about Small Mart now."

Johnson: "OK, well hang out there for a little and then I'll head that way like within an hour."

UBM-1: "Alright."

Johnson: "Alright, bye."

UBM-1: "See ya"

[Your Affiant believes that during the conversation, Johnson told UBM-1 that she just woke up. Johnson and UBM-1 discussed wanting to meet and UBM-1 indicated that he was near the Small Mart, which is a convenience store located on Highway 98 in Santa Rosa Beach, Florida. Johnson said that she was going to meet UBM-1.]

59.     On March 22, 2020, at approximately 3:14 p.m., Johnson, using Target

Telephone 1, received a call from UBM-1, who was using **Target Telephone 3** (call

session 3580). During the conversation, the following was stated:

UBM-1: "Hello, Hello"

Johnson: "What are you doing?"

UBM-1: "Where you at?"

Johnson: [inaudible] "I'm about to leave my house."

UBM-1: "Oh"

Johnson: "Where you at?"

UBM-1: "In Destin now."

Johnson: "[inaudible] give a fuck. Alright, um so are you getting out or am I going to have to come to you aren't I."

UBM-1: "I can meet you half way, I can meet you at the apartments."

Johnson: "Alright, alright."

UBM-1: "I'm talking about the the the housing apartment."

24

Johnson: "The ones on in Santa Rosa Beach."

UBM-1: "On 98."

Johnson: "Yeah okay, alright we can do that, um, I'll call you, I'll call you, I'll leave my house like within 10 minutes but I will call you so you know I left."

UBM-1: "Uh huh."

Johnson: "Okay bye"

[Your Affiant believes that during the conversation, Johnson agreed to meet UBM-1 at an unidentified house development in Santa Rosa Beach, Florida.]

60.     On March 22, 2020, at approximately 3:51 p.m., Johnson, using Target

Telephone 1, received a call from UBM-1, who was using **Target Telephone 3** (call

session 3609). During the conversation, the following was stated:

Johnson: "Hey."

UBM-1: "Where you at?"

Johnson: "I just pulled out of my house."

UBM-1: "Oh yeah."

Johnson: "Alright."

UBM-1: "Alright."

Johnson: "Alright, meet you at the apartment?"

UBM-1: "Yeah."

Johnson: "Alright, bye"

[Your Affiant believes that during the conversation, Johnson told UBM-1 that she was leaving her house to meet UBM-1. They agreed to meet at an unidentified apartment.]

61.    On March 22, 2020, at approximately 4:00 pm, law enforcement observed, via covert camera, Johnson depart her residence, located at 680 Mallet Bayou, Freeport, Florida, in an Audi convertible car. Additionally, law enforcement observed, via the GPS tracker located in the Johnson trap device, that the device moved from Johnson's residence at the approximately the same time Johnson left.[15]

62.    Shortly after Johnson departed her residence, law enforcement observed Johnson driving her blue Audi, and traveling west on Chat Holley Road from Highway 331, Walton County, Florida.16

63.    On this same date, at approximately 4:07 p.m., Johnson, using Target Telephone 1, received a call from UBM-1, who was using **Target Telephone 3** (call session 3618). During the conversation, the following was stated:

Johnson: "Hey."

UBM-1: "Yes?"

Johnson: "Hey."

---

15  During the time surveillance units followed Johnson until the time Johnson met the UBM-1, the GPS locator embedded in the Johnson trap device followed the same route as Johnson traveled.

16  2007 blue Audi convertible blue bearing Florida Tag FF24B- registered to Shelley Johnson.

UBM-1: "Yes?"

Johnson: "I am almost to the chicken store."

UBM-1: "Alright."

Johnson: "Alright."

UBM-1: "Yeah."

Johnson: "Alright I'll see you there."

[Your Affiant believes that during the conversation, UBM-1 was trying to locate Johnson. Johnson said that she was near the Chicken Store, an unknown location in Santa Rosa Beach, Florida. UBM-1 said that he would meet Johnson at this location.]

64.    Between approximately 4:09 p.m. and 4:14 p.m., Johnson, using Target Telephone 1, exchanged a series of text messages with UBM-1, who was using **Target Telephone 3**. (Call Sessions # 3620, 3628, and 3638). During the conversation, the following was stated:

Johnson: "U got blues"

UBM-1: "A few"

Johnson: "Do I got time to stop and pee?"

[Your Affiant believes that during the conversation, Johnson asked UBM-1 if he had any Percocets for sale. UBM-1 said he had some and then Johnson asked if she had time to use the restroom.]

27

65.     On this same date (March 22, 2020), at approximately 4:14 p.m., Johnson, using Target Telephone 1, received a call from UBM-1, who was using **Target Telephone 3**. (Call Session 3642). During the conversation, the following was stated:

Johnson: "Hey."

UBM-1: "I need to get some gas, where you at?"

Johnson: "Do what?"

UBM-1: "I need to get some gas, where you at?"

Johnson: "Uhm, I just passed the store so, uhm, I am almost to the road to turn..."

UBM-1: [unintelligible]

Johnson: "OK, is that the subway?"

UBM-1: "Hah?

Johnson: "Is that the subway?"

UBM-1: "Yo"

Johnson: "Yeah?"

[Your Affiant believes that during the conversation, UBM-1 and Johnson agree to meet at the Subway restaurant, (Express Lane Gas Station and Subway restaurant) located at 7930 W. Highway 30a, Santa Rosa Beach, Florida.]

66. At approximately 4:19 p.m., law enforcement observed a black Chevrolet Impala bearing Florida license plate Z231VS stopped in the southbound turn lane of Highway 98 at Highway 30a.

67. Law enforcement observed Johnson driving the blue Audi behind the Impala. Law enforcement then observed the Audi and Impala pull into and park at the Express Lane Gas Station and Subway restaurant located at 7930 W. Highway 30a, Santa Rosa Beach, Florida. As the Impala was making a U-turn on Highway 98, law enforcement observed a white female, identified as Amy Mary Hoffman, in the passenger seat of the Impala.[17] Law enforcement observed the Impala parked at a gas pump as Johnson, driving the Audi, parked directly behind the Impala. The UBM-1 exited the driver's seat of the Impala and Johnson exited the Audi. Law enforcement observed Johnson meet UBM-1 at the entrance to the gas station. Law enforcement observed the two briefly talk (law enforcement could not hear the conversation) and then they both entered the store. Law enforcement could not observe Johnson and/or the UBM-1 inside the store. After approximately two minutes, the UBM-1 and Johnson exited the store. UBM-1 and Johnson had a brief conversation as they walked towards their vehicles. (Law enforcement could not hear their conversation.) Law enforcement lost sight of Johnson and the UBM-1

---

17 Law enforcement later observed a Florida Driver's license photograph of Amy Mary Hoffman DOB: 11/03/1989 and positively identified Hoffman as the female passenger in the Impala.

prior to them entering their vehicles. At approximately 4:22 p.m., law enforcement terminated surveillance.

68.　Based on the above information, your affiant believes that Johnson obtained at least one ounce of methamphetamine and Percocets from UBM-1 in Santa Rosa Beach, Florida. Further, your affiant believes that UBM-1 used **Target Telephone 3**, via oral and electronic communications, to coordinate the transaction with Johnson, using Target Telephone 1.

69.　On March 24, 2020, between approximately 1:21 a.m. and 11:42 a.m., Johnson, using Target Telephone 1, sent a series of text messages to UBM-1, who was using **Target Telephone 3** (call sessions # 4515, 4624, and 4676) During the conversation, the following was stated:

Johnson: "U ok…Hey…Call me"

[Your Affiant believes that during the conversation, Johnson was asking UBM-1 to call her.]

70.　On this same date, at approximately 12:11 p.m., Johnson, using Target Telephone 1, received an incoming call from UBM-1, who was using **Target Telephone 3** (call session # 4698). The call was not answered.

71.　On this same date (March 24, 2020), between approximately 1:21 a.m. and 11:42 a.m., Johnson, using Target Telephone 1, exchanged a series of text

30

messages with UBM-1, using **Target Telephone 3** (call sessions # 4700, 4702,

4704, and 4706). During the conversation, the following was stated:

UBM-1: "Yo."

Johnson: "Wyd...I need to see you."

UBM-1: "Nothing. In srb"

[Your Affiant believes that during the conversation, UBM-1 told Johnson that he was in "srb" or Santa Rosa Beach, Florida.]

72.    On this same date, at approximately 12:16 p.m., Johnson, using Target

Telephone 1, received an incoming call from UBM-1, who was using **Target**

**Telephone 3** (call session # 4708). During the conversation, the following was

stated:

Johnson: "Whatcha doin?"

UBM-1: "What's up with it?"

Johnson: "Uhh. Nothin. Umm..You good on things?"

UBM-1: "Not blues."

Johnson: "Not blues...umm...alright well. Umm. I should grab some more

boi."

UBM-1: "I got coke too."

Johnson: "Huh?"

UBM-1: "I got coke too."

31

Johnson: "You got coke too?"

UBM-1: "Mmmm hmm"

Johnson: "Alright. [yawn] Ok. Well come see me."

UBM-1: "Where you at? Home?"

Johnson: "Yeah."

UBM-1: "I'll be over there in a bit."

Johnson: "Alright. Bye."

[Your Affiant believes that during the conversation, UBM-1 said that he was out of Percocets. Johnson said that she needed to purchase more "boi"or heroin. UBM-1 said that he had "coke" or cocaine for sale. Johnson acknowledged that UBM-1 had cocaine and then told UBM-1 to come to Johnson's residence.]

73. On this same date, between approximately 2:07 p.m. and 2:08 p.m.,

Johnson, using Target Telephone 1, exchanged a series of text messages with UBM-

1, who was using **Target Telephone 3** (call sessions # 4768, and 4770). During the

conversation, the following was stated:

UBM-1: "Finna hit bridge."

Johnson: "Ok."

[Your Affiant believes that during the conversation, UBM-1 told Johnson that he was getting onto the bridge or the Choctawhatchee Bay Causeway bridge on Highway 331.]

32

74.    On this same date (March 24, 2020), at approximately 2:18 p.m.,

Johnson, using Target Telephone 1, received an incoming call from UBM-1, using

**Target Telephone 3**.  (Call Session # 4772)  During the conversation:

> Johnson: "Hey"
>
> UBM-1: "I'm about to pull up."
>
> Johnson: "You here?"
>
> UBM-1: "Yeah."
>
> Johnson: "Alright. I'm coming out."
>
> [Your Affiant believes that during the conversation, UBM-1 told Johnson that he was arriving at Johnson's residence.]

75.    At approximately, 2:20 p.m., law enforcement observed, via covert

camera, a black Chevrolet Impala[18] pull into and park in front of Johnson's

residence.  Law enforcement did not observe anyone exit the Impala.  Law

enforcement observed Johnson exit the front door to the residence and walk to the

Impala.  The camera view was mostly obscured due to a tree blocking the camera.

At approximately 2:24 p.m., law enforcement observed Johnson re-enter the front

door to the residence.  The Impala departed the residence.

---

18  This is the same vehicle observed by law enforcement on March 22, 2020.

**Hayes Distribution:**

76.    Further, since March 19, 2020, based on the GPS tracking data for the Johnson Trap Device, intercepted communications over Target Telephone 1 and 2, pole camera footage at **SUBJECT PREMISES 1,** and physical surveillance, your affiant believes that Johnson frequently used the Johnson Trap Device to store, transport and deliver narcotics to and from **SUBJECT PREMISES 1** to **SUBJECT PREMISES 2**.

77.    For example, on or about April 3, 2020, based on wire and electronic interceptions on Target Telephone 1, as detailed below, your affiant believes that Johnson transported two ounces of methamphetamine from **SUBJECT PREMISES 2** to Roy Hayes in Mossyhead, Florida, where Johnson sold the methamphetamine to Hayes. Following this drug transaction, Johnson returned to **SUBJECT PREMISES 2** and met Young. Later that night, Johnson and Young departed **SUBJECT PREMISES 2**, met with Samantha O'Banion, and sold her approximately four ounces of methamphetamine in DeFuniak Springs, Florida. Following the transaction, Johnson and Young traveled to the **SUBJECT PREMISES 1**.

78.    On April 3, 2020, Johnson, utilizing Target Telephone 1, and Hayes, utilizing (850) 517-8602, exchanged a series of phone calls and text messages (Call

Session: 11714, 11738, 11742, 11759, 11772). During the conversation, Johnson agreed to sell "2" or two ounces of methamphetamine to Hayes. They agreed to meet at the Raceway gas station, located on Highway 90 in Mossyhead, Florida.

79     At approximately 5:04 p.m. based on GPS tracker data, the Johnson Trap Device departed **SUBJECT PREMISES 2**. Prior to Hayes reaching out to Johnson, the Johnson Trap Device and the Young Trap Device were located at **SUBJECT PREMISES 2**. The Johnson Trap Device traveled south on County Road 1089 to the intersection of US Highway 90. The Johnson Trap Device then traveled west on US Highway 90 before briefly stopping at the Sunoco Gas Station, located at 12526 US Highway 90, DeFuniak Springs, Florida. The Johnson Trap Device then again traveled west on US Highway 90 towards the Raceway Gas Station.

80.     At approximately 5:21 p.m., the Johnson Trap Device arrived at the Raceway Gas Station. At approximately 5:34 p.m., the Johnson Trap Device departed the Raceway Gas Station traveling east on US. Highway 90. The Johnson Trap Device stopped at a couple of unknown locations in DeFuniak Springs, Florida and then returned to **SUBJECT PREMISES 2**. Because **SUBJECT PREMISES 2** is located in a remote location, where law enforcement surveillance would easily be noticeable, law enforcement relied heavily on the GPS tracker to monitor his

35

movements coming and going from the residence. However, as detailed below, on April 16, 2020, law enforcement observed a courier, identified as Donald Black, heading down the driveway of **SUBJECT PREMISES 2.** Based on wire intercepts, law enforcement was aware that Black was delivering methamphetamine to Young.

**O'Banion Distribution**:

81. On this same date, Johnson, using Target Telephone 1, and Samantha O'Banion, using (850) 333-1593, exchanged a series of text messages and phone calls (Call Sessions 11706, 11717, 11736, 11747, 11774, 11787, 11789, 11791, 11793, 11821, 11823, 11827, 11828, 11879, 11887, and 11953). During the conversation, Johnson agreed to sell O'Banion "3.5" for "1300." O'Banion asked Johnson if she was at **SUBJECT PREMISES 1** and Johnson told her that "No were about ot leave James" **(SUBJECT PREMISES 2)**. Johnson and O'Banion then agreed to meet in DeFuniak Springs, Florida. O'Banion told Johnson that she was at the "KFC" or Kentucky Fried Chicken in DeFuniak Springs, Florida. [Your affiant believes that during the conversation, O'Banion asked to purchase 3.5 ounces of methamphetamine for $1,300].

82. Shortly thereafter, law enforcement observed a red Ford Escape, believed to belong to O'Banion's, parked at the Kentucky Fried Chicken, located at 2482 U.S. Highway 331 S, DeFuniak Springs, Florida.

36

83. On this same date, Johnson, using Target Telephone 1, and O'Banion, using (850) 333-1593, exchanged a series of text messages and phone calls (Call Sessions 11970, 11974, 11991, 11993, 11999, 12001, 12008, 12012, 12018, 12020, 12026, 12033, 12037). During the conversation, O'Banion told Johnson she was at the "KFC" or the Kentucky Fried Chicken and Johnson agreed to meet there. O'Banion and Johnson then agreed to meet at the "76" or 76 gas station to conduct the transaction.

84. Law enforcement observed that, the Johnson Trap Device and Young Trap Device departed **SUBJECT PREMISES 2**. From approximately 10:19 p.m. to 10:44 p.m., law enforcement observed the Johnson Trap Device and Young Trap Device travel south from Sexton Road to the 76 gas station, located at 2396 Highway 331 N. DeFuniak Springs, Florida.

85. Law enforcement observed the Ford Escape depart the Kentucky Fried Chicken and relocate to the 76 gas station, located at 2396 U.S. Highway 331 S, DeFuniak Springs, Florida. Law enforcement observed the Ford Escape back into a parking spot located on the west side of the building. After parking, law enforcement observed a white female, believed to be O'Banion, exit the passenger side of the Ford Escape and walk into the store.

37

86.    Law enforcement observed Young's black Ram 2500, previously identified on prior surveillance operations, pull into and park at the 76 gas station next to a gas pump. 19

87.    While at the 76 gas station, Johnson, using Target Telephone 1, called O'Banion, using (850) 333-1593  (Call Session 12046). During the conversation, Johnson told O'Banion, "I'll pull back there in just a second."

88.    At approximately 10:46 p.m., law enforcement observed O'Banion walking away from the area where Young's Ram truck was parked.    Law enforcement observed O'Banion walk back to the Ford Escape and enter the front passenger seat.  Law enforcement observed Young's Ram truck relocate to the west side of the gas station and park on the passenger side of the Ford Escape. The Ram and Ford were parked passenger side to passenger side.  While the vehicles were parked next to each other, law enforcement did not observe anyone exit the vehicles, nor could law enforcement see if the windows on the vehicles were down.

89.    Law enforcement then observed the Ram truck depart the gas station. Shortly afterwards, the Ram truck departed the gas station. Then the Ford departed the parking lot. Surveillance was not continued on either the Ram or the Ford.

---

19 2016 black Ram 2500 truck black bearing Florida Tag HIXZ47- registered to James Young.

90. The Johnson Trap Device and Young Trap Device departed the gas station at approximately the same time. Law enforcement observed that the Johnson Trap Device and Young Trap Device appeared to travel from the gas station to **SUBJECT PREMISES 1**.

### UF-1, Black, and April 16, 2020, Delivery of Methamphetamine:

91. On April 16, 2020, Young arranged the delivery of approximately four kilograms of methamphetamine from an unidentified female (hereinafter, "UF-1") source of supply. Further, the UF-1 is believed to have used a courier identified as Donald Black (hereinafter, "Black") to deliver the methamphetamine to Young at the **SUBJECT PREMISES 1**. Following the delivery of the methamphetamine, Young is believed to have transferred some or most of the methamphetamine to **SUBJECT PREMISES 2**.

92. Between April 9, 2020, and April 15, 2020, Young, using Target Telephone 2, and UF-1, using (678) 713-0456, exchanged a series of text messages and phone calls discussing.UF-1 coordinating the delivery of approximately three kilograms of suspected methamphetamine to Young in Freeport, Florida. UF-1 told Young that a male, believed to be Black (Donald Black), would transport the methamphetamine to Young in Walton County, Florida (Call Sessions 295, 735, 737, 742, 746, 750, 752, 954, 1190, 1231, 1232, 1233, 1236, 1242, 1319, 1321, 1323,

39

1325, 1327, 1329, 1331, 1335, 1337, 1341, 1343, 1451, 1453, 1522, 1524, 1531, 1768, 2019, 2031, 2075, 2143, 2267, 2353, 2454, 2457, 2458, 2459, 2534, 2566, 2663, 2665, 2667, 2669).

93.     During the conversations, UF-1 said that she was going to "snatch up all" she could.  UF-1 asked Young if he wanted "3" and Young responded that he wanted "3r4 either one."  UF-1 said that "they went up on me unless if you want to pay 73 a piece I could get them brought to you like that."  Young, at first, did not agree to purchase the methamphetamine but then told UF-1 that he did want to purchase the methamphetamine.  UF-1 verified that "he's leaving now now he's gonna come on now down now so…. He'll be down by mornin time some time ok." Young replied, "Ok."  [Your affiant believes that during the conversation, UF-1 asked how many kilograms of methamphetamine Young wanted.  Young indicated he wanted three or four kilograms.  UF-1 told Young the price of one kilogram of methamphetamine increased to $7,300.   If Young agreed to purchase the methamphetamine, UF-1 said that she would have it delivered to Young.  UF-1 told Young that Black was going to deliver the methamphetamine in the morning].

94.     Independent of this investigation, the DEA in Atlanta, Georgia, was conducting a drug investigation into the methamphetamine trafficking of UF-1 and Black.  Through the course of their investigation, DEA Atlanta identified the user of

40

phone number (770) 540-6827, as Black. DEA Atlanta had not yet identified UF-1. Based on their investigation, DEA in Atlanta, Georgia, obtained a federal court order authorizing the interception of Precision Location Information for (770) 540-6827 (hereinafter "Black Phone"). [20]

95.     On April 16, 2020, GPS location information (hereinafter, "Ping"), for the Black Phone showed that it was located on I-85 north of Montgomery, Alabama. The Black Phone eventually began to move south toward Florida.

96.     At approximately 10:40 a.m., law enforcement observed a Nissan Titan truck travelling south on Highway 231 from Highway 82 just south of Montgomery, Alabama. Law enforcement observed that the Nissan truck displayed Georgia license plate RVD7543.[21] Law enforcement drove past the Nissan truck and positively identified the driver and sole occupant as Black. Continuous surveillance was not conducted on the Nissan truck.

97.     Between approximately 11:53 a.m. and 12:03 p.m., Young, using Target Telephone 2, and Black, using the Black Phone, exchanged a series of text messages (Call Session 2805, 2807, 2809, 2811, 2813, 2815). During the

20 On or about April 1, 2020 the Honorable Alan Baverman Magistrate Judge with the U.S. District Court for the Northern District of Georgia signed an order authorizing the interception of Precision Location Information for (770) 540-6827.

21 Based on law enforcement databases, this vehicle is registered to Black.

conversation, Black said, "I'm 30 mintues away." Young replied, "Hey bro if I give you another address 680 Mallet Drive Freeport, FL 32439 [**SUBJECT PREMISES 1**] Come on you go on the boat with us I was just fixing to text you when you hit me up 680 Mallet Bayou rd Freeport, FL 32439 Let me know if you got all this." Black said, "Ok I'm an hour away." Young replied, "Cool come on."

98.     At approximately 1:13 p.m., Young, using Target Telephone 2, received a text message from Black, using the Black Phone (Call Session 2832). Black told Young, "I'm here." During this period, law enforcement had observed Black entering the driveway of **SUBJECT PREMISES 2**.

99.     At approximately 1:12 p.m., law enforcement observed, via the pole camera, a green Nissan Titan bearing Georgia license plate RVD7543 pull into and park in the driveway of the **SUBJECT PREMISES 1**. Law enforcement observed Black exit the driver's seat of the Nissan. Law enforcement observed Young walking around his black Ram truck parked in the driveway. Black and Young greeted each other at the front of the Nissan truck and then walked out of sight behind some trees. Law enforcement observed Black walk back to the Nissan and reposition the Nissan in the driveway in front of the residence. The Nissan was blocked by a foliage from the view of the camera. Law enforcement observed Young get into the driver's seat of the Ram truck. Law enforcement observed Black walk from the area

42

of the Nissan truck and get into the Ram truck. The Ram truck departed the residence.

100. At approximately 1:47 p.m., Young, using Target Telephone 2, called Johnson, using Target Telephone 1 (Call Session 2845). During the conversation, Young told Johnson, "Hey I'm gonna need you to bag up a 15." Johnson replied, "Ok." Young asked, "You got that?" Johnson replied, "Yeah." Young said, "You gonna have that [unintelligible] ok cuz he's in a hurry. Cuz when we get back we just gonna pay him and he can go and we gonna leave cuz we been waistin our day ok." Johnson stated, "ok." [Your affiant believes that Black told Young he wanted to leave town so Young told Johnson to get together $15,000 in U.S. currency for Black. Once Black was paid, Black was going to leave town.]

101. At approximately 10:27 p.m., law enforcement, via the pole camera, observed the Ram truck return to **SUBJECT PREMISES 1**. The Ram truck backed into the garage area of **SUBJECT PREMISES 1**. The Ram truck was out of view of the camera. Law enforcement observed the Ram truck pull out of the garage area towing a jet ski. Young exited the Ram truck and walked out of sight toward **SUBJECT PREMISES 1**. Law enforcement observed Young and Black walk to the Ram Truck where they shook hands. Black appeared to walk back the Nissan truck and at approximately 2:27 p.m., the Nissan truck departed **SUBJECT**

43

**PREMISES 1.**

102. Following the transaction, on April 17, 2020, between approximately 12:11 p.m. and 12:18 p.m., Young, using Target Telephone 2, and an individual believed to be Michael Smith, using (850) 630-6542, exchanged a series of text messages (Call Sessions 3170 and 3176). Smith asked James, "How about it" and Young responded, "I'm home at camper." [Your affiant believes that Young was referring to his home at **SUBJECT PREMISES 2**. Additionally, ping information for Target Telephone 2 during this text message (Call Session 3170) showed that it was located in the area of **SUBJECT PREMISES 2**].

103. At approximately 2:55 p.m., Young, using Target Telephone 2, received a call from Johnson, using Target Telephone 1 (Call Session 3262). During the conversation, Johnson asked Young if he left any "go anywhere". Young told her "no" and told Johnson that he would "be there shortly" and would bring "some." Young added that he thought she had an "ounce or something left" and Johnson told him that she did not. [Your affiant believes that during the conversation, Johnson asked Young if he left any of the three kilograms of methamphetamine at **SUBJECT PREMISES 1**. Young indicated that he did not. Young indicated that he would bring some methamphetamine, from **SUBJECT PREMISES 2**, to Johnson at

44

**SUBJECT PREMISES 1**. During this phone call, there was no ping initiated that showed Target Telephone 2's location.]

104. On April 24, 2020, Young, using Target Telephone 2, received a series of text messages from UF-1, using (678) 713-0456 (Call Sessions 6324, 6329, 6334). During the conversations, UF-1 told Young, "Okay I just put it up I'm going to count it I never did even open it yet. But I'm investing it tomorrow so that's why I asked there is only $16,140 here I have it all it's been in my position and I'm about to send you it and I just open the envelope. Let me know what we should do please." UF-1 sent the following pictures:



105. On this same date at approximately 2:45 p.m., Young, using Target Telephone 2, received a phone call from UF-1, using (678) 713-0456 (Call Sessions 6339). During the conversation, UF-1 and Young discuss that Young was short on how much money he gave Black to deliver to UF-1 for the methamphetamine delivered to Young on April 16, 2020. UF-1 verified that Young purchased four kilograms of methamphetamine and paid $7,200 per kilogram. UF-1 told Young

45

that she was about to "invest" in the purchase of methamphetamine and heroin. Young wanted UF-1 to get Young more "blue" heroin because the other heroin he previously purchased from her was of poor quality. UF-1 told Young that she would work on obtaining some for Young.

106. Based on the above listed information, your affiant believes that on April 16, 2020, Johnson received a shipment of four kilograms of methamphetamine from Donald Black at the **SUBJECT PREMISES 1**. Following the delivery of the methamphetamine, at some point between April 16, 2020, and April 17, 2020, Young transferred all or most of the methamphetamine to the **SUBJECT PREMISES 2**.

### April 16, 2020 Delivery of Methamphetamine to C. Bones:

107. As detailed above in this affidavit, your affiant believes that C. Bones sold heroin to Johnson on March 20, 2020. Also, as detailed below, your affiant believes that C. Bones purchases methamphetamine from Johnson and then distributes that methamphetamine to unidentified customers. Your affiant believes that C. Bones stores drugs and proceeds from the sale of heroin and methamphetamine at his residence, **SUBJECT PREMISES 3**.

108. On April 16, 2020, between 12:52 p.m. and 2:23 p.m., Johnson, using Target Telephone 1, exchanged a series of text messages with C. Bones, using (850)

46

517-7834 (Call Sessions: 19074, 19076, 19096, 19098, 19100, 19104, 19106, 19131, 19149, 19151, 19153, 19155, and 19157). During the conversation, Johnson said, "I'm home. I need 9v battery" Bones replied, "Ok I have some." Johnson said, "Well way." Bones asked, "Whole is still 400? Omw in 5 min Damn. I could find my phone. I haven't left yet." Johnson replied, "450 Well Actually I'll let u know in a few." Bones, "Omw. Now Can u have ready? I gotta hall ass please." [Your affiant believes that during the conversation, C. Bones asked Johnson if the price for one ounce of methamphetamine was $400.00. Johnson replied that one ounce cost $450.00. C. Bones agreed to meet Johnson to purchase the methamphetamine.]

109. At approximately 2:28 p.m., law enforcement observed C. Bones depart his residence located at **SUBJECT PREMISES 3**. Law enforcement observed C. Bones driving his silver Land Rover.22  Law enforcement conducted surveillance on C. Bones and observed C. Bones turn north on US Highway 331 from US Highway 98.

110. At approximately 2:31 p.m., Johnson, using Target Telephone 1, placed an outgoing call to C. Bones, using (850) 517-7834 (Call Session: 19164). During the conversation, C. Bones told Johnson that he had just turned into the Tom Thumb.

---

22 2003 silver Land Rover SUV Silver bearing Florida tag IMW95- registered to Christopher Bones.

Johnson asked C. Bones to meet him at "Black Creek....boat ramp?" C. Bones agreed. Johnson asked C. Bones how much he wanted to purchase and C. Bones told Johnson, "O." Johnson agreed and gave C. Bones directions to the Black Creek boat ramp. [Your affiant believes that during the conversation Johnson agreed to sell C. Bones one ounce of methamphetamine.]

111. At approximately 2:33 p.m., law enforcement observed, via the pole camera, Johnson depart **SUBJECT PREMISES 1** in a vehicle. At approximately 2:38 p.m., law enforcement observed C. Bones turn right on to County Road 3280 from US Highway 331 and travel eastbound.

112. At approximately 2:40 p.m., law enforcement observed C. Bones' silver Range Rover drive passed the Black Creek store towards the Black Creek boat ramp. Between approximately 2:44 p.m. and 2:49 p.m., Johnson, using Target Telephone 1, received a series of text messages from C. Bones, using (850) 517-7834 (Call Sessions: 19216, 19217, 19218, 19219, 10220, and 19222). C. Bones texted Johnson several times, "Imhere."

113. At approximately 2:50 p.m., law enforcement conducted surveillance of the Black Creek boat ramp. While driving past the boat ramp, law enforcement observed Johnson and Young standing next to a vehicle known to be Young's Dodge Ram truck.

48

114. At approximately 3:05 p.m., law enforcement observed C. Bones' silver Range Rover pull into the parking lot of the Black Creek General store. Law enforcement observed C. Bones parked at the gas pumps. C. Bones then exited the vehicle and walked into the general store. At approximately 3:16 p.m., law enforcement observed C. Bones exit the general store, enter into the driver's seat of the Range Rover, and exit the parking lot onto County Road 3280.

115. At approximately 3:20 p.m., law enforcement observed the Range Rover at the intersection of County Road 3280 and US Highway 331 South. C. Bones observed the Range Rover turn onto US Highway 331 and travel southbound. Law enforcement continued surveillance of C. Bones and observed him travel to **SUBJECT PREMISES 3**. Law enforcement observed C. Bones walking from the Range Rover toward the front of the **SUBJECT PREMISES 3**. Law enforcement was unable to observe C. Bones enter the **SUBJECT PREMISES 3**. However, **SUBJECT PREMISES 3** is a detached single family home. Based on this, your affiant believes that C. Bones took the methamphetamine he purchased from Johnson into the **SUBJECT PREMISES 3** for safekeeping and further distribution.

116. After surveillance was terminated, between approximately 3:39 p.m. and 4:35 p.m., Johnson, using Target Telephone 1, and C. Bones, using (850) 517-7834, exchanged a series of text messages. (Call Sessions 19261, 19278, 19283,

49

19285, 19287, 19289, 19291, 19293). During the conversation, Johnson told C. Bones, "Fake 20." [Your affiant believed that Johnson was informing C. Bones that he had been given a counterfeit $20.00 when C. Bones paid her for the methamphetamine]. Johnson followed up by sending C. Bones a photograph of the counterfeit $20.00 bill stacked on top of more U.S. currency.



117.   C. Bones reacted surprisingly and told Johnson, "No tellin how may I've gotten…2 days ago I had 25gs in 20's lol Alto of them looked like that. I just figured they were new." [Your affiant believes that during the conversation, C. Bones had $25,000 in drug proceeds and some of the $20.00 bills looked similar to the counterfeit bill.]

118.   Based on the above information, your affiant believes that on April 16, 2020, C. Bones purchased nine ounces of methamphetamine from Johnson.

Following the meeting, C. Bones is believed to have transported the methamphetamine back to **SUBJECT PREMISES 3**. Additionally, based on C. Bones indicating that he had $25,000 in suspected drug proceeds, your affiant believes that C. Bones stores drug proceeds at **SUBJECT PREMISES 3**.

119. On or about May 2, 2020, Young, using Target Telephone 2, called Angelia Ross, using (770) 466-0945 (Call Session 9227). During the conversation, Ross told Young that she is working on "stuff" so if Young comes to Ross' location, she will have "several" for Young. Young then told Ross that he was coming to meet her. [Your affiant believes that Ross is coordinating the procurement of methamphetamine to sell to Young when he comes to meet her in Atlanta, Georgia].

120. On May 3, 2020, Young, using Target Telephone 4, had a phone call with Johnson, using Target Telephone 2 (Call Session 9699). During the conversation, Young told Johnson that he had rented a Ford Mustang convertible. [Your affiant believes that Young rented the vehicle to make the trip to Atlanta, Georgia, in order to purchase methamphetamine.]

121. On May 3, 2020, the Young Trap Device left **SUBJECT PREMISES 2**. At approximately the same time, the ping for Target Telephone 2 pinged in the same general area as the Young Trap Device.

51

122. Between May 3, 2020 and May 4, 2020, the Young Trap Device was in the area of Atlanta, Georgia, to include the area of Angela Ross' residence, located at 3455 Lake Carlton Road, Logansville, Georgia.

123. On May 4, 2020, Young, using Target Telephone 2, exchanged a series of text messages, with Alicia Rutledge, using (850) 460-4881. (Call Sessions 9928, 9953, 9967, 9971) During the conversation, Young told Rutledge that he was on the road but would be back tonight. [Your affiant believes that Young will return to Walton County, Florida sometime tonight with an undetermined amount of methamphetamine.] Your affiant does not know what time Young will return to Walton County and consequently requests an "anytime" warrant.

**III. CONCLUSION:**

124. Based on the Walton County Property Appraiser database, Johnson is listed as the owner of **SUBJECT PREMISES 1**. C. Bones is listed as the owner of **SUBJECT PREMISES 3**. Young is not listed as the owner of **SUBJECT PREMISES 2**.

125. Your affiant respectfully submits that there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841 and 846 will be found at **SUBJECT PREMISES 1**, **SUBJECT PREMISES 2**, and **SUBJECT PREMISES 3,** to include all outbuildings, with each specifically described in Attachment A. Your

52

affiant requests authorization to seize evidence of these violations located at these residences, as specifically set forth in Attachment B. Pursuant to 21 U.S.C. § 879, your affiant requests an "anytime" warrant to be executed once Young returns to Walton County. Furthermore, your affiant seeks authorization to search and seize Target Telephone 1 (Johnson) and Target Telephone 2 (Young). Your affiant seeks to seize items of evidence contained in these cellular phones as specifically set forth in Attachment B. Finally, your affiant seeks to search and seize the vehicles used by Johnson, Young, and C. Bones, which are specifically described in Attachment A, to violate 21 U.S.C. §§ 841 and 846, for items specifically described in Attachment B.

Kevin M. Miller
Special Agent
Drug Enforcement Administration

Sworn to before me this ___4th___ of May, 2020.

/s/ Michael J. Frank
Honorable Michael J. Frank
United States Magistrate Judge

## Attachment A

1.    The **Subject Premises 1,** including any outbuildings, is located at 680 Mallet
Bayou Road, Freeport, Florida. The **Subject Premises 1** is further described as a
single-family dwelling, white in color with dark colored contrasting shutters
flanking the windows on the front. From Mallet Road the driveway to the residence
is circular and extends along the south side of the residence. There is a fountain in
the middle of the circular driveway. The residence is two stories with a two story
front overhanging porch supported by four white columns. There is an oval shaped
glass window along the top of the overhanging front porch. There is no fence
surrounding the residence. There were no visible numbers affixed to the residence
indicating "680." From the intersection of Carol Drive and Mallet Bayou Road,
travel northwest from this intersection approximately .5 miles. The driveway to the
**Subject Premises 1** is located on the west side of Mallet Bayou Road. There are no
visible numbers along the front of the residence.



2.    The **Subject Premises 2,** including any outbuildings, is located at 1390 Sexton Road, DeFuniak Springs, Florida.   The **Subject Premises 2** is further described as a single-family dwelling, blue in color with white lattice work along the bottom of the siding.  The **Subject Premises 2** has a silver/gray metal roof.  There is a wooden privacy fence surrounding the residence with wooden lattice trim along the top of the fence.  The **Subject Premises 2** has a front overhanging porch along the southeast side front of the residence.  Further, there is a dirt driveway along the west side of the residence connecting the back yard to Sexton Road.  There are no visible numbers affixed to the residence indicating "1390."  From the intersection of County Highway 1087 (New Harmony Road) travel east on Sexton Road approximately .6 miles to the **Subject Premises 2**.  The **Subject Premises 2** is located along the north side of Sexton Road.



3.      The **Subject Premises 3**, including any outbuildings, is located at 69 Macy Lane, Santa Rosa Beach, Florida. The **Subject Premises 3** is further described as a single-family dwelling, with brown brick siding and blue shutters flanking the windows. The residence is one story with a brown roof. The front door to the residence faces north toward Macy Lane with an attached walkway. The walkway follows the front of the residence west to the driveway to the **Subject Premises 3**. The driveway to the residence is located on the west side of the **Subject Premises 3**. The driveway extends from an attached garage to Bella Boulevard. There is a black mailbox at the end of the driveway. There were no visible numbers on the residence indicating "69." From the intersection of Denny Drive travel west on Macy Lane approximately 100 yards to the **Subject Premise 3**. The **Subject Premises 3** is located at the southeast corner of Macy Lane and Bella Boulevard.



**4.** **2016 black Ram 2500 truck black bearing Florida Tag HIXZ47-** registered to James Young.

**5.** **2007 blue Audi convertible blue bearing Florida Tag FF24B-** registered to Shelley Johnson.

**6.** **2003 silver Land Rover SUV Silver bearing Florida tag IMW95-** registered to Christopher Bones.

**7.** **Target Telephone** 1: cellular telephone with phone number 850-842-1976, with International Mobile Equipment Identifier (IMEI) number 3533000751637140, that was activated on the AT&T network on February 7, 2018. AT&T records show that the subscriber listed for Target Telephone 1 is Shelley Johnson at 680 Mallet Bayou Rd., Freeport, Florida, 32439. Target Telephone has been used by Shelley Johnson to violate 21 U.S.C. § 841 and 846.

**8.** **Target Telephone 2**: cellular telephone with telephone number (404) 435-2996, with IMEI 3538951040538507, that was activated on the AT&T telephone company network on June 4, 2013. AT&T records show that the subscriber listed for Target Telephone 2 is James Young at 427 Fish Hole Loop, Merryville, Louisiana, 70653. Target Telephone has been used by James Young to violate 21 U.S.C. § 841 and 846.

## ATTACHMENT B

The items to be seized are as follows:

a.　Methamphetamine, heroin, cocaine, and other controlled substances;

b.　Firearms and ammunition;

c.　Documents of any kind describing the price, quantity, receipt, purchase, sale, storage, distribution, or ownership, of methamphetamine, heroin, cocaine, and other controlled substances;

d.　Documents of any kind describing orders for, or money received or paid in exchange for, methamphetamine, heroin, cocaine, and other controlled substances;

e.　Documents of any kind which list the names, addresses, and telephone numbers of partners or associates in the illegal importation, sale, or distribution of methamphetamine, heroin, cocaine, or other controlled substances, in violation of Title 21, United States Code, Sections 841 and 846.

f.　Financial ledgers, pay and owe sheets, and personal phone books, which show importation, sales, distribution, or possession of methamphetamine, cocaine, heroin, and other controlled substances;

g.　Cash and other valuables, such as gold and silver, derived from the importation, sale, or distribution of methamphetamine, heroin, cocaine, or other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

h.  Paraphernalia commonly associated with the importation, packaging, distribution, and sales of methamphetamine, heroin, cocaine, and other controlled substances (such as scales, weighing devices, money counters, and measuring devices, packaging materials);

i.  Any indicia of ownership, occupancy, possession, or control of the locations, motor home or things listed in this attachment, including utility and other bills, correspondence, lease or rental agreements or receipts, trust deeds, escrow documents and registration documents; and

j.  Cellular telephones, listed in Attachment A, for violations of 21 U.S.C. §§841 and 846, and specifically:

1.  Outgoing and incoming text messages and e-mails;

2.  Phone logs of incoming and outgoing calls, texts, and emails;

3.  Photographs;

4.  Internet activity to including the examination of communication applications such as Snapchat, Whatsapp, Instagram, and Facebook and other electronic communications used to communicate with customers and suppliers; and

5.  Contact lists.